UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELISSA CADILLIC, ) | |
| ) | |
| JOSEPH CADILLIC, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| PRESIDENT AND FELLOWS OF ) | |
| HARVARD COLLEGE, ) | |
| ) | |
| FRANCIS D. RILEY, individually and in ) | |
|    his role as Chief of Police of the ) | |
|    Harvard University Police Department, ) | |
| ) | |
| MAURA HAYES, in her individual capacity, ) | |
| ) | |
| JESSE SNELL, in his individual capacity, ) | |
| ) | |
| JOHN (and/or Jane) DOES, ) | |
| ) | |
|     Defendants ) | |

### COMPLAINT AND JURY DEMAND

#### INTRODUCTION

      This is a "section 1983" civil rights action sounding primarily in false arrest and malicious prosecution. Plaintiff Joseph Cadillic, a private investigator, was investigating a homicide on the Harvard campus, accompanied by his wife, the co-plaintiff. A student allowed the plaintiffs access to the homicide scene. Despite being aware that the student had allowed access, the Harvard Police arrested the plaintiffs and used excessive force to do so. They also maliciously charged the plaintiffs with crimes including breaking and entering.

After having spent approximately $22,000 to defend themselves, the plaintiffs were exonerated of all criminal allegations.

## PARTIES

1. Plaintiff Elissa C. Cadillic is an individual who is a resident and domiciliary of the Commonwealth of Massachusetts.

2. Plaintiff Joseph A. Cadillic is an individual who is a resident and domiciliary of the Commonwealth of Massachusetts.

3. Defendant Maura Hayes is an individual whose residence and domiciliary are unknown to the plaintiff. At all pertinent times, Ms. Hayes was a duly appointed and acting officer of the Harvard University Police Department, and a paid employee of Harvard.

4. Defendant Jesse J. Snell is an individual whose residence and domiciliary are unknown to the plaintiff. At all pertinent times, Mr. Snell was a duly appointed and acting officer of the Harvard University Police Department, and a paid employee of Harvard.

5. At all relevant times, the John (and/or Jane) Doe defendants were duly appointed and acting officers of the Harvard University Police Department, acting under color of law, and paid employees of Harvard.

6. At all relevant times, Defendant Francis D. Riley was the Chief of Police of the Harvard University Police Department, and was a duly appointed and acting officer of the Harvard University Police Department, acting under color of law, a paid employee of Harvard,

7. Defendant President and Fellows of Harvard College ("Harvard") is an entity that can sue and be sued, organized pursuant to the laws of the Commonwealth of Massachusetts and headquartered in Cambridge, Middlesex County. On information and belief each of the above named Hays and Snell (and all John Doe defendants) in addition to being employees

of the Department, are Special State Police Officers appointed by the Colonel of Massachusetts State Police and are thereby authorized to make arrests for criminal offenses committed on Harvard's campus.

## STATEMENT OF JURISDICTION

This action seeks monetary damages pursuant to 42 U.S.C. §§ 1983, and the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.  Therefore, jurisdiction is premised upon 28 U.S.C. §§ 1331and 1343.  State claims brought pursuant to Massachusetts law are before the court pursuant to the doctrines of pendant or supplemental jurisdiction.

## FACTS COMMON TO ALL COUNTS
### THE ARREST

8. In May 2009, Joseph A. Cadillic was employed as an investigator by Nardizzi & Associates, Inc. a private detective business licensed pursuant to G.L. c. 147 s. 25.

9. On or about May 18, 2009, an individual named Justin Cosby was killed in the Kirkland House dormitory on the Harvard University campus.

10. Nardizzi & Associates, Inc. was privately retained to make an investigation of the homicide.

11. Nardizzi & Associates, Inc. assigned Joseph A. Cadillic to the investigation and instructed him to attempt to interview possible witnesses including students at Kirkland House for relevant information and to photograph and videotape the alleged crime scene and document the crime scene.

12. On or about May 30, 2009, Mr. Cadillic accompanied by his wife, Elissa Cadillic, went to Kirkland House, hoping to speak to students and to take photographs and videotape.

13. Outside of Kirkland House, they encountered a woman named Kathleen Breeden.

14. Ms. Breeden was a registered Harvard University student and a resident of Kirkland House.

15. Ms. Breeden told the Cadillics that she lived in Kirkland House, J entry.

16. Mr. Cadillic told Ms. Breeden that he was a private investigator and he showed her identification; handing her his legitimate business card which read in pertinent part "Joseph Cadillic, Investigator, NARDIZZI & ASSOCIATES, INC." He also stated that he was investigating the recent shooting and seeking to photograph and videotape the area, as well as interview students; in short, explaining the purpose of his visit.

17. Ms. Breeden agreed to allow the Cadillics entry into Kirkland House. Using her electronic/magnetic passkey card in the Cadillic's presence, she opened the courtyard gate for the Cadillics and allowed them entry into Kirkland House.

18. The Cadillics entered Kirkland House with Ms. Breeden's express permission. She showed them bullet holes and permitted them to remain in the area to videotape and take photographs. The Cadillics thanked Ms. Breeden.

19. The Cadillics committed no crimes while in Kirkland House. At no time did either of the Cadillics encounter any police officer inside Kirkland House. At no time did any police officer observe either of the Cadillics inside Kirkland House, although one or more officers may have one or both Cadillics at the moment of egress.

20. After only a few minutes, Joseph Cadillic walked outside. Elissa Cadillic remained inside.

21. Shortly after stepping outside Mr. Cadillic was approached by the defendant, Harvard University Police Officer Maura Hayes.

22. Unbeknownst to the Cadillics, Kathleen Breeden had approached Officer Hayes and told Officer Hayes that she had let the Cadillics into Kirkland House. In addition, Ms. Breeden had apparently given Officer Hayes the business card which Mr. Cadillic had given to her.

23. Mr. Cadillic properly identified himself to Officer Hayes and told her what he had been doing; that he was a private investigator hired to do an investigation and had been taking pictures.

24. At Officer Hayes' request, Mr. Cadillic went back to the door of Kirkland House and called out to his wife, asking her to come out of the building. She promptly did so.

25. Officer Hayes did not ask the Cadillics to leave Harvard property and they never refused to leave.

26. Officer Hayes asked Ms. Cadillic for ID. When Ms. Cadillic told Officer Hayes that she did not have it with her, Officer Hayes told her that she could be arrested for not having any identification. In fact, Ms. Cadillic's identification was in her car, close by.

27. Shortly thereafter, Officer Jesse Snell arrived at the scene and began to interrogate Mr. Cadillic. Mr. Cadillic gave Officer Snell his business card and answered all questions related to his conduct on the scene truthfully.

28. Officer Snell was made aware that Kathleen Breeden was a resident of Kirkland House, J entry, and that she had let the Cadillics into Kirkland House.

29. Officer Snell demanded that Mr. Cadillic disclose the identity of his client. Mr. Cadillic responded that it was his belief that it was illegal for him to do so and in fact he refused to divulge the information. In response, Officer Snell threatened to arrest him.

30. Eventually the officers commenced the process of walking the Cadillics off Harvard property and accompanied them as they headed towards the courtyard gate.

31. Just as they were approaching the gate the officers arrested the Cadillics. The officers walked the Cadillics out the Dunster Street gate. They placed handcuffs on them, cuffing them behind their backs. This was done in front of a large group of students and other onlookers. The officers then ordered the Cadillics to sit on the ground.

32. Ms. Cadillic told the officers that she had recently had knee surgery and that being made to sit on the ground with her hands cuffed behind her back was causing significant acute pain at the operation site  They ignored her.

33. The Cadillics sat, with their arms cuffed behind them for approximately fifteen (15) minutes until a transport wagon arrived.

34. During the wagon transport, Ms. Cadillic suffered an apparent panic attack, the first she experienced in her life, and had great difficulty breathing. By the time the wagon arrived at a station, Ms. Cadillic's leg was throbbing. She could not exit the wagon without assistance and felt unsteady walking.

35. Upon arrival at the station, the Cadillics were searched. A female officer put her hands into Ms. Cadillic's pants' pockets and performed an aggressive pat down. The Cadillics were then handcuffed to a metal rail on a wall above a bench in the lock-up area. It was impossible for them to sit facing forward. They had to twist to the side, with their cuffed arm elevated. They remained in the Police Station for approximately four hours, cuffed most if not all of the time.

36. Ms. Cadillic suffered additional apparent panic attacks throughout this period of time, frequently hyperventilating, her body shaking.

37. As the Cadillics were held handcuffed, officers went through their belongings. A male officer went into Ms. Cadillic's purse, pulled out a tampon, held it up, and asked Ms. Cadillic what it was and how to spell it.

38. Ms. Cadillic told an officer that she needed to use the bathroom and needed the tampon. A female officer accompanied her to a restroom and watched her while she changed tampons. Later, Ms. Cadillic became nauseous. When she so advised another officer the officer placed a garbage can on the floor next to her as she sat handcuffed to the wall.

39. Several officers demanded that the Cadillics show them all of the photographs saved in their cell phones and threatened to keep the phones as evidence.

40. The Cadillics were fingerprinted, photographed, returned to the bench, and were handcuffed to the wall again.

41. Several male and female officers, whose identities are not now known, participated in the searching of the Cadillics, and in handcuffing them to the wall.

42. Eventually, the Cadillics were issued a "verbal trespass warning." Essentially they were told that they were forbidden from going on Harvard property in the future.

43. They were then were transported to a Cambridge Police station.

44. During the ride to the Cambridge Police station, while handcuffed in a wagon, Ms. Cadillic again suffered an apparent panic attack and had great difficulty breathing.

45. At the Cambridge Police station, the Cadillics were separated, processed and placed in holding cells. Their shoes, belts and jewelry were taken. They were at the station for about an hour, a large segment of which was spent locked up in holding cells until their bail was posted and they were released. Throughout this time, Ms. Cadillic's knee was in severe

pain. She continued to suffer apparent panic attacks, with uncontrollable shaking and difficulty breathing.

46. The Cadillics then returned to the Harvard Police station to get their belongings and pick up the keys to their car. They were told that the officer with responsibility over their logged property was gone and that they would have to return the next day. Unlogged property was returned.

47. By the time they arrived home it was after midnight, over seven hours from the time their ordeal began.

## FORMAL CRIMINAL PROCEEDINGS

48. The Cadillics were summoned to appear in court the following Monday. Ms. Cadillic had to take a personal day off from work.

49. The Cadillics were charged with a two count criminal complaint: Trespass, pursuant to M.G.L. c. 266 § 120, and Breaking and Entering, pursuant to M.G.L. c. 266 § 16A.

50. The defendants and each of them were instrumental in instituting the charges and pursuing the charges. In addition, the defendants and each of them participated in publishing a public police log falsely stating to users of the internet (a worldwide potential audience) that the Cadillics had committed theft. A true copy of the log is attached hereto and incorporated herein.

51. The Cadillics were forced to hire private counsel, William Crowe, Esq., to defend the frivolous criminal case brought against them.

52. In due course, Mr. Crowe filed a carefully drafted motion to dismiss, together with a memorandum of law and affidavits.

53. On or about July 29, 2009, after a hearing on the motion to dismiss, Judge Roanne Sragow dismissed all of the criminal charges.

54. Judge Sragow's decision is tantamount to a ruling that there was no probable cause for the arrest.  These criminal charges remained pending for approximately two months.

55. The pendency of these charged caused Ms. Cadillic to suffer anxiety and stress. She works for the City of Cambridge and the Boston Public Library and was genuinely concerned that she might suffer an adverse employment action.

56. Any properly trained police officer would have known or should have known that the crimes of "Trespass" and "Breaking and Entering" are not committed when a resident of a dormitory grants an individual entry into the dormitory.

57. Harvard had an obligation to properly train its police officers on the elements of criminal charges, including Trespass and Breaking and Entering.  Harvard did not properly train or supervise its police officers to assure that they complied with the law in arresting people for Trespass or Breaking and Entering.

58. At all pertinent times, Harvard had a policy or custom of deliberate indifference to misconduct by its police officers by failing to properly investigate misconduct and to discipline officers.  Harvard also had a policy or custom of tolerating a "code of silence" in which police officers understood that they were not to report misconduct by fellow officers.

59. The individual defendants' actions were taken with reckless disregard for the plaintiffs' constitutional rights. After the charges against the Cadillics were dismissed, Harvard neither investigated nor disciplined the arresting officers.

## DAMAGES

60. The Cadillics were shocked and humiliated at being arrested. Mrs. Cadillic suffered emotional distress, which included physiological manifestations such as persistent sleeplessness, severe anxiety, panic attacks, depression, and loss of appetite and weight. Mr. Cadillic also suffered physically and emotionally albeit with less physical manifestations. They suffered physical pain during their detention. They suffered anxiety over the impact of their arrest on their professional positions and income.

61. As the criminal case progressed, Ms. Cadillic had to use a week of personal/vacation time to deal with court appearances and lawyer meetings.

62. The Harvard Police seized and refused to return Mr. Cadillic's camera, holding it unlawfully. Mr. Cadillic had to purchase a replacement camera, a necessity for his work, at a cost of approximately $400.00.

63. Newspaper articles appeared in the *Boston Herald*, *the Boston Globe* and the *Harvard Crimson*. The story was picked up on *WickedLocal.com*. These stories caused the Cadillics humiliation, mental anguish and distress.

64. As a consequence of her arrest, detention and the publicity caused by the Defendant Harvard Police officers, Elissa Cadillic suffered fear, embarrassment, humiliation, anxiety and panic attacks, sleeplessness, depression, hair loss, tearfulness, irritability, mood swings and sleep bruxism. She was diagnosed with Acute Stress Disorder.

65. As a consequence of his arrest, detention and the publicity caused by the defendant Harvard Police officers, Joseph Cadillic suffered fear, embarrassment, humiliation, and anger at the behavior of the defendants for their treating him like a criminal and for their causing distress and pain to his wife.

66. The Cadillics' marital relations were also damaged.

67. The Cadillics both suffered professional embarrassment and possible loss of professional opportunities and income as a direct result of their arrest, detention and the publicity caused by the defendants.

68. As stated above, the Cadillics spent approximately $22,000.00 defending themselves, which expenditure led to their complete exoneration of all criminal charges.

COUNT ONE
VIOLATION OF 42 U.S.C. § 1983
AGAINST HAYES AND SNELL

69. Plaintiffs repeat and reallege each and every allegation above stated as though such allegations were set forth herein.

70. At all pertinent times, Defendants Hayes and Snell acted under color of law.

71. By engaging in the conduct described above, the defendants deprived plaintiffs of clearly established and well settled constitutional rights.  Specifically, the defendants deprived plaintiffs of rights secured and guaranteed to them by the United States Constitution including, but not limited to, their Fourth Amendment right to be free from unlawful seizure of their persons, their Eighth Amendment prohibition against cruel and unusual punishment, and their Fifth and Fourteenth Amendment rights to due process of law.

72. Further, the wrongful acts were undertaken with grossly reckless disregard of plaintiffs' constitutional rights, and include without limitation the following:

    a. The defendants failed to heed the import of Ms. Breeden's open acknowledgement that she had voluntarily allowed the Cadillics access to Kirkland House;

    b.      The defendants fabricated a criminal charge that was not supported by any evidence to justify their illegal actions;

    c.      The defendants arrested the plaintiffs without probable cause that a crime was committed;

    d.      The defendants intentionally filed materially false documents and/or pleadings with the intention of causing an illegal, unconstitutional and unreasonable arraignment and prosecution against Plaintiff when the defendants knew or should have known there were neither grounds nor probable cause for such prosecution;

    e.      The defendants charged plaintiffs with crimes that Defendants knew or should have known were based upon incomplete, unsupported, and fabricated evidence, which evidence Defendants knew or should have known was false;

    f.      Each of the defendants agreed with each other and others in a conspiracy to deprive plaintiffs of their rights, privileges and immunities as guaranteed and protected by the Constitution of the United States and the laws of the Commonwealth of Massachusetts in violation of the provisions of 42 U.S.C. § 1983;

    g.      The defendants used excessive force in effectuating the arrest of Elissa Cadillic.

73. As a result of the defendants' violations of the Mr. Cadillic's civil rights, he suffered a loss of freedom, loss of enjoyment of life, loss of ability to earn income, extreme emotional distress and were otherwise damaged.

74. As a result of the defendants' violations of Ms. Cadillic's civil rights, she suffered a loss of freedom, loss of enjoyment of life, loss of ability to earn income, extreme emotional distress and was otherwise damaged.

75. The above constitutes violations of 42 U.S.C. § 1983 et seq.

## COUNT TWO
## VIOLATION OF 42 U.S.C. § 1983
## AGAINST DEFENDANT RILEY
## (SUPERVISORY LIABILITY)

76. Plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

77. At all pertinent times, Defendant Riley acted under color of law.

78. When Officers Snell and Hayes violated the plaintiffs' constitutional rights as described above, they acted under the authority and command of the Defendant Riley. Riley was a Chief of Police in the Harvard Police Department. Riley authorized the malicious prosecution. On information and belief, he also authorized the illegal arrest itself.

79. Chief Riley failed to provide adequate supervision of his officers.

80. The actions of the Defendant Riley were performed maliciously, purposely and intentionally, in bad faith, and in violation of plaintiffs constitutional rights described above.

81. In this particular case, Riley, in violation of 42 U.S.C. § 1983, was grossly negligent and deliberately, recklessly or callously indifferent to the constitutional rights of the plaintiffs.

82. At all pertinent times Defendant Riley was acting under the color of state law when he violated the Cadillics' constitutional rights in violation of 42 U.S.C. § 1983 and he is liable to the Cadillics individually and as an official of the University.

83. Defendant Riley deprived plaintiffs of their rights to the security of their person and the right to liberty in violation of the United States Constitution including, but not limited to,

the Fourth, Eighth and Fourteenth Amendments, which constitutes a violation of 42 U.S.C. § 1983.

84. Plaintiffs suffered great damage as the direct and proximate cause of the actions of Chief Riley.

## COUNT THREE
## VIOLATION OF 42 U.S.C. § 1983
## AGAINST TRUSTEES AND FELLOWS

85. Plaintiffs repeat and reallege each and every allegation above stated as though each and every such allegation were set forth herein.

86. At all times material to this Complaint, Defendant "Trusteees" (Harvard) maintained policies, procedures, and/or customs of deliberate indifference to the constitutional rights of persons lawfully upon the campus which caused the deprivation of plaintiffs' constitutional rights. These customs practices and policies included:

   a. Failure to hire qualified police officers;

   b. Failure to properly train qualified police officers;

   c. Failure to properly discipline police officers;

   d. Failure to properly supervise police officers.

87. Defendants' conduct in fabricating a criminal case against plaintiffs included the failure to properly investigate and gather evidence.

88. Such conduct was consistent with inadequate and negligent training and with the policies and customs of the Trustees at the time they took the actions.

89. The Trustees were grossly negligent and deliberately indifferent to the civil rights of its citizens, all in violation of 42 U.S.C. § 1983.

90. These violations of law were the direct and proximate cause of great damage to Plaintiffs.

## COUNT FOUR
## VIOLATION OF 42 U.S.C. § 1983
## EXCESSIVE FORCE/CRUEL AND UNUSUAL TREATMENT
## JOHN (and/or Jane) DOE DEFENDANTS

91. Plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

92. Leaving the plaintiffs handcuffed to a bench for 4 hours in an uncomfortable position was the equivalent of an unprovoked attack, seizure, and beating, and therefore constituted the use of excessive and unreasonable force in violation of plaintiffs' rights guaranteed by the United States Constitution including, but not limited to, the Fourth, Eighth and Fourteenth Amendments.

93. By this and other unnecessary cruel actions as described above, the defendants intended to inflict, and did inflict, serious and permanent physical and emotional injuries upon plaintiffs.

## COUNT FIVE
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983
## ALL DEFENDANTS

94. Plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

95. By having engaged in the conduct described above, the defendants conspired to deprive plaintiffs of the equal protection of the law or of the equal privileges and immunities under the law, and they acted in furtherance of the conspiracy, which resulted in the injury to plaintiffs described above, in violation of 42 U.S.C. § 1983.

## COUNT SIX
## VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT
## ALL DEFENDANTS

96. Plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

97. By engaging in the conduct described above, including threats, intimidation and coercion, the defendants interfered with and deprived plaintiffs of their exercise and enjoyment of their civil rights secured under the laws of the Commonwealth of Massachusetts, all in violation of Massachusetts General Laws Chapter 12 § 11I.

98. As a direct and proximate result of the defendants' violations of M.G.L. c. 12 § 11I, plaintiffs suffered the injuries described above.

## COUNT SEVEN
## MALICIOUS PROSECUTION
## ALL DEFENDANTS

99. Plaintiffs repeat and reasserts the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

100. Defendants Hayes and Snell signed a police report or reports based upon information they knew, or should have known to be false and in so doing led directly to the improper institution of criminal proceedings against plaintiffs. This was done as agents of the Trustees and at the behest of each defendant who shared this intention and acted in concert. The intention was to cause a prosecution of the plaintiffs and did in fact cause prosecution.

101. The defendants did so with malice and without probable cause, and were motivated in part by a desire to alleviate what they perceived as public pressure to deal proactively with the

homicide at Harvard. Said malicious prosecution caused the Cadillics to suffer personal injuries, pain, anguish of mind and economic loss, and were otherwise damaged.

## COUNT EIGHT
## FALSE ARREST AND IMPRISONMENT

102. Plaintiffs incorporate herein the above paragraphs.

103. Defendant Police Officers Hayes and Snell intentionally arrested the plaintiffs without any legal justification.

104. Chief of Police Riley authorized, participated in and condoned the illegal arrest.

105. As a direct and proximate result of the defendant police officers' wrongful arrest of the plaintiffs, the plaintiffs suffered personal injuries, pain, anguish of mind and economic loss, and were otherwise damaged.

## COUNT NINE
## VICARIOUS LIABILITY
## AGAINST TRUSTEES

106. Plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporate them by reference as if fully and completely set forth herein.

107. To the fullest extent allowable under any theory of law, the Trustees (Harvard) are vicariously liable for the acts of their agents, servants and employees, including all persons named as defendants, but also including any other persons involved in the unconstitutional and otherwise flawed investigation and aborted prosecution of Plaintiffs.

### COUNT TEN
### NEGLIGENCE
### TRUSTEES

108. Plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

109. The Defendant Harvard had a duty to the plaintiffs to assure that it, through its agents, employees or servants did not initiate a meritless and groundless criminal prosecution. The Defendant Harvard also had duties to use reasonable care in the hiring, training, supervision and discipline of its officers.

110. The Defendant breached its duties owed to plaintiffs when a meritless and groundless criminal prosecution was initiated against them.

111. The Defendants' breach of duty was the proximate cause of damages sustained by plaintiffs.

112. As a result of the Defendant Harvard's negligent breaches of duty, the plaintiff suffered in business and in personal and professional reputation, suffered emotional distress and was otherwise damaged.

### COUNT ELEVEN
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST ALL DEFENDANTS

113. Plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

114. The intentional and or grossly reckless actions described above attributable to each individual defendant, jointly and severally were outrageous and beyond the scope of common decency.

115. The intentional and or grossly reckless actions described above attributable to each defendant, caused the plaintiff to suffer great emotional distress.

Respectfully Submitted,<br>
ELISSA AND JOSEPH CADILLIC,<br>
By and through their attorneys,<br><br>

*/s/ Robert S. Sinsheimer*<br>
Robert S. Sinsheimer, BBO#464940<br>
Lauren Thomas, BBO#667973<br>
Michael Harriman, BBO#680061<br>
SINSHEIMER & ASSOCIATES<br>
92 State Street, 9th Floor<br>
Boston, MA 02109<br>
(617) 722-9954

Dated: May 23, 2012